NOT YET SCHEDULED FOR ORAL ARGUMENT

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| CITY OF PHOENIX, ARIZONA, | ) ) ) | |
| Petitioner, | ) ) | |
| STORY PRESERVATION ASSOCIATION, INC. et al. | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Case Nos. 15-1158 & 15-1247 |
| MICHAEL HUERTA, Administrator of the Federal Aviation Administration, and | ) ) ) ) ) | Petitions for Review |
| FEDERAL AVIATION ADMINISTRATION, | ) ) ) | |
| Respondents. | ) ) | |

_____

**FINAL BRIEF OF PETITIONER CITY OF PHOENIX**
_____

John E. Putnam
Peter J. Kirsch
Nathaniel H. Hunt
KAPLAN KIRSCH & ROCKWELL LLP
1001 Connecticut Avenue, NW, Suite 800
Washington, DC 20036
(202) 955-5600

Attorneys for Petitioner City of Phoenix

## CERTIFICATE OF PARTIES, RULINGS UNDER
## REVIEW, AND RELATED CASES

Under Circuit Rule 28(a)(1), Petitioner City of Phoenix certifies as follows:

**Parties and Amici.** The Petitioner is the City of Phoenix, Arizona (the City). Respondents are Michael Huerta, Administrator of the Federal Aviation Administration (FAA), and FAA. On November 9, 2015, this Court granted FAA's motion to consolidate a related proceeding, *Story Preservation Association, Inc. et al. v. Federal Aviation Administration*, Case No. 15-1247, and thus, Story Preservation Association, Inc. *et al.* are also Petitioners. There are no amici in this proceeding.

**Rulings under Review.** The final agency action under review in this case is FAA's decision to implement new departure routes, known as Area Navigation (RNAV) routes, at Phoenix Sky Harbor International Airport without conducting an adequate environmental review of the routes or addressing the City's requests for consultation on the impacts of the routes, including the adverse noise impact of the routes on the City's parks and historic properties. The City challenges FAA's final order in the form of a June 1, 2015, letter from FAA Regional Administrator Glen Martin to Phoenix City Manager Ed Zuercher in which FAA concluded its environmental review of the RNAV routes and finally denied the City's requests that FAA reinitiate consultation under the National Historic Preservation Act and return the routes to pre-September 2014 routes. FAA's action denied the City's

i

request to complete an adequate review of the routes' environmental and historical effects.

**Related Cases.**  This case has not previously been before this Court or any other court.  There are no related cases currently pending in this Court or any other court of which counsel is aware.

Respectfully submitted on August 25, 2016.

Attorneys for Petitioner City of Phoenix:

/s/ *John E. Putnam*
John E. Putnam
jputnam@kaplankirsch.com
Peter J. Kirsch
pkirsch@kaplankirsch.com
Nathaniel H. Hunt
nhunt@kaplankirsch.com
KAPLAN KIRSCH & ROCKWELL LLP
1001 Connecticut Avenue, NW, Suite 800
Washington, DC 20036
(202) 955-5600
(202) 955-5616 (fax)

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION ................................................................ 1

STATEMENT OF ISSUES ........................................................................... 2

STATEMENT OF CASE .............................................................................. 3

STATEMENT OF LAW AND FACTS ......................................................... 5

    I.      LEGAL FRAMEWORK ............................................................. 5

          A.    FAA Order 7100.41 ...................................................... 5

          B.    National Historic Preservation Act ................................ 6

          C.    Section 4(f) of the Department of Transportation Act..... 8

          D.    National Environmental Policy Act ................................ 9

    II.     FACTUAL BACKGROUND ................................................... 11

          A.    Airport Operations and Airspace .................................. 11

          B.    Environmental Review of the RNAV Routes ............... 12

          C.    There Were Immediate Impacts from the
RNAV Routes ................................................................ 14

          D.    FAA Informs the City that It Would Address the
Noise Problems ............................................................. 17

          E.    FAA Admits Its Analysis Was Deficient;
SHPO Rescinds Its Concurrence .................................. 19

          F.    FAA Reestablished a Working Group to "Explore
Potential Adjustments to the Procedures to
Better Manage Noise Issues" ........................................ 20

G.    The City Provided Substantial Information on the Impact of the RNAV Routes ................................... 21

H.    FAA's June Letter Concluded the RNAV Implementation Process ................................. 23

SUMMARY OF ARGUMENT ................................... 26

STANDING OF CITY OF PHOENIX ........................... 28

A.    The City Continues to Suffer Concrete Injuries ............ 29

B.    The City's Injuries Are the Result of FAA's RNAV Routes and Are Redressable .............................. 30

STANDARD OF REVIEW ........................................ 31

ARGUMENT ................................... 32

I.    THE CITY'S PETITION IS TIMELY UNDER 49 U.S.C. § 46110 ................................... 32

A.    The June Letter Is a Final Order that Marked the Conclusion of FAA's RNAV Route Implementation Process ................................ 32

B.    Even if the Court Finds that FAA's September 18, 2014, Commencement of RNAV Routes Is an Order, the 60-day Period for Filing a Petition for Review of that Order Was Tolled ................................ 35

II.    FAA's NHPA DECISIONS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND VIOLATE FAA's CONSULTATION OBLIGATIONS ........................... 39

A.    FAA's Finding of No Adverse Effect Was Arbitrary and Capricious Because FAA Relied on Unsupported Assumptions ............................... 39

B. FAA Failed to Consult with the City Under the NHPA ............................................................. 42

C. FAA Failed to Reinitiate NHPA Consultation Despite New Information Demonstrating Adverse Effects on Historic Properties ..................................... 44

III. FAA VIOLATED SECTION 4(f) OF THE DOT ACT .......... 49

A. FAA Failed to Consult with the City on the Impacts of the RNAV Routes on Section 4(f) Resources ........... 49

B. FAA's Determination that the RNAV Routes Would Not Substantially Impair Section 4(f) Resources Was Arbitrary ................................. 50

IV. FAA VIOLATED THE APA BY FAILING TO COMPLY WITH ORDER 7100.41 ........................................... 53

V. FAA VIOLATED NEPA BY RELYING ON A CATEGORICAL EXCLUSION ................................. 54

A. FAA Had No Basis to Conclude that the RNAV Routes Would Not Have Significant Impacts on NHPA and Section 4(f) Resources ................................... 54

B. The RNAV Routes Are Highly Controversial, Which Was Clear to FAA at the Time of Its Categorical Exclusion ................................. 55

C. FAA Failed to Reevaluate Its Categorical Exclusion in Violation of the APA and NEPA .............................. 58

CONCLUSION AND RELIEF SOUGHT ................................. 61

# TABLE OF AUTHORITIES

## Cases[1]

*Aerosource, Inc. v. Slater,*
   142 F.3d 572 (3d Cir. 1998) ....................................................... 32

*Allied-Signal v. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) ........................................... 61, 62

*Am. Bird Conservancy, Inc. v. FAA,*
   516 F.3d 1027 (D.C. Cir. 2008) ................................................ 56

*Amerijet Int'l, Inc. v. Pistole,*
   753 F.3d 1343 (D.C. Cir. 2014) ............................................... 52

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council,*
   462 U.S. 87 (1983) ............................................................... 9, 59

*BFI Waste Sys. Of N. Am. v. FAA,*
   293 F.3d 527 (D.C. Cir. 2002) ................................................. 31

*Citizen Advocates for Responsible Expansion, Inc. v. Dole,*
   770 F.2d 423 (5th Cir. 1984) ........................... 42, 45, 51, 52

*Citizens to Preserve Overton Park v. Volpe,*
   401 U.S. 402 ........................................................................... 50

*City of Dania Beach v. FAA,*
   485 F.3d 1181 (D.C. Cir. 2007) ......................... 29, 30, 32, 35

*City of Grapevine v. Dept. of Transp.,*
   17 F.3d 1502 (D.C. Cir. 1994) ................................................ 8

*City of Las Vegas v. FAA,*
   570 F.3d 1109 (9th Cir. 2009) ................................................ 29

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

*City of New Jersey v. CONRAIL*,
    668 F.3d 741 (D.C. Cir. 2012)..................................................... 30

*City of Olmstead Falls v. FAA*,
    292 F.3d 261 (D.C. Cir. 2002)..................................................... 29

*D&F Afonso Realty Trust V. FAA*,
    216 F.3d 1191 (D.C. Cir. 2000)............................................ 28, 31

*Dep't of Transp. v. Paralyzed Veterans of America*,
    477 U.S. 597 (1986)..................................................... 36

*Di Perri v. Federal Aviation Admin.*,
    671 F.2d 54 (1st Cir. 1982)..................................................... 29

*Druid Hills Civic. Assoc. v. FAA*,
    772 F.2d 700 (11th Cir. 1985) ..................................................... 51

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)..................................................... 32

*Friends of Richards-Gebaur Airport v. FAA*,
    251 F.3d 1178 (8th Cir. 2001) ..................................................... 58

*Grand Canyon Trust v. FAA*,
    290 F.3d 339 (D.C. Cir. 2002)..................................................... 55

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).............................................. 31, 49

*National Conservative Political Action Comm. V. FEC*,
    626 F.2d 953 (D.C. Cir. 1980)..................................... 43, 50, 54

*New York v. Nuclear Regulatory Comm'n*,
    681 F.3d 471 (D.C. Cir. 2012)..................................................... 61

*Oregon Natural Desert Ass'n v. BLM*,
    531 F.3d 1114 (9th Cir. 2008) ..................................................... 42

*Paralyzed Veterans of America v. Civil Aeronautics Board,*
     752 F.2d 694 (D.C. Cir. 1985)................................................................ 36, 37

*Petroleum Commc'ns v. FCC,*
     22 F.3d 1164 (D.C. Cir. 1994)........................................ 44, 49, 53, 59, 61

*Safe Extensions, Inc. v. FAA,*
     509 F.3d 593 (D.C. Cir. 2007)....................................................... 32, 36, 41

*W. Deptford Energy, LLC v. FERC,*
     766 F.3d 10 (D.C. Cir. 2014).................................................................... 58

**Statutes and Public Laws**

5 U.S.C. § 551(6) ....................................................................................... 32

5 U.S.C. § 706 ............................................................................................... 2

*5 U.S.C. § 706(2)(A).................................................................................. 31

42 U.S.C. § 4321 ........................................................................................... 3

42 U.S.C. § 4332(2)(C)................................................................................ 9

*49 U.S.C. § 303(c) .................................................................... 2, 8, 28, 50

49 U.S.C. § 46110 ...................................................................................... 32

49 U.S.C. § 46110(a) .............................................................................. 1, 36

49 U.S.C. § 46110(c) .................................................................................. 31

*54 U.S.C. § 300101 ................................................................................ 2, 6

54 U.S.C. § 306108..................................................................................... 6, 43

FAA Modernization Reform Act of 2012,
     Pub. L. No. 112-95, § 213(c)(1), 126 Stat. 11 ................................... 10

**FAA Regulations, Orders and Other Regulatory Materials**

*36 C.F.R. § 800.2 ................................................................ 7, 27, 30, 42

*36 C.F.R. § 800.4(a) ..................................................................... 7, 42

*36 C.F.R. § 800.4(b) ......................................................................... 7

*36 C.F.R. § 800.4(c) .......................................................................... 7

36 C.F.R. § 800.4(d) ...................................................................... 7, 43

*36 C.F.R. § 800.5 .......................................................................... 7, 8, 44

36 C.F.R. § 800.6 ........................................................................... 8, 44

*36 C.F.R. § 800.13(b)(1) ........................................................ 8, 28, 34, 44, 49

40 C.F.R. § 1501.2 ............................................................................... 9

40 C.F.R. § 1508.4 ............................................................................... 9

*FAA Order 1050.1E ...................... 9, 10, 11, 12, 28, 40, 41, 43, 49, 50, 51, 54, 55

FAA Order 7100.9, *Standard Terminal Arrival Program and Procedures* ....... 5, 6

*FAA Order 7100.41, *Performance Based Navigation Implementation Process* (2014) ..................................... 2, 5, 6, 27, 28, 33, 34, 35, 53, 54, 58

**Other**

Circuit Rule 28(a)(7) ........................................................................ 28

ix

# GLOSSARY OF TERMS

APA.............................................................................. Administrative Procedure Act

City............................................................................................... City of Phoenix

DOT Act.............................................................Department of Transportation Act

EA ...................................................................................Environmental Assessment

EIS......................................................................... Environmental Impact Statement

FAA...................................................................Federal Aviation Administration

IER ............................................................................ Initial Environmental Review[2]

PBN Working Group ................................................ Performance Based Navigation
Working Group[3]

NEPA ...............................................................National Environmental Policy Act

NHPA...........................................................National Historical Preservation Act

RNAV .............................................................................................Area Navigation

SHPO................................................................State Historic Preservation Officer

---

[2]  The City includes the acronym "IER" to make the Court aware of the term as it appears in FAA's administrative record in this proceeding.  The City does not use the acronym "IER" in the brief.  Instead, the City refers to FAA's Initial Environmental Review as the "Initial Review."

[3]  The City provides acronyms for "Performance Based Navigation Working Group" and "Area Navigation" as both terms are commonly referenced by their acronyms in FAA's implementation of new Area Navigation procedures and routes at issue in this case.  Further explanation of these terms is provided in the brief.

## STATEMENT REGARDING ADDENDUM OF
## STATUTES AND REGULATIONS

Under Circuit Rule 28(a)(5), relevant statutes, regulations, and agency orders are submitted in a separate Addendum filed concurrently with this brief. Citations to the Addendum in this brief are marked "AD."

## STATEMENT OF JURISDICTION

This Court has jurisdiction over the City of Phoenix's (City) petition for review of the Federal Aviation Administration's (FAA) decision to implement and not modify new flight departure routes, known as Area Navigation (RNAV) routes, at Phoenix Sky Harbor International Airport (Airport) under 49 U.S.C. § 46110(a). FAA's June 1, 2015, letter to the City (June Letter) that denied the City's repeated requests for route modification and reinitiation of consultation and environmental review is a final order under § 46110(a), AD-014.  The City filed this petition for review on June 1, 2015, within the 60-day period for seeking review under § 46110(a), AD-014.

On July 17, 2015, FAA moved to dismiss the City's petition alleging that the June Letter was not a final order, and, thus, this Court lacked jurisdiction.  The City opposed FAA's motion, demonstrating that the June Letter is a reviewable final order and the petition is timely.  On December 4, 2015, this Court referred FAA's motion to the merits panel and ordered the parties to address the issues presented in the motion, which the City does on pages 32–39 of this brief.[4]

---

[4] The Court's review of the June Letter should be based on FAA's administrative record including all information considered by FAA leading up to that decision. However, the City has made a formal request in a concurrently-filed motion for the Court to consider post-September 18, 2014, evidence discussed in this brief if the Court determines FAA's start of the RNAV routes on that date is the only reviewable order.

1

## STATEMENT OF ISSUES

1)      Did the City timely file a petition for review when it filed within 60 days of FAA's June Letter that (a) followed months of FAA commitments to modify the RNAV routes, (b) completed FAA's implementation of the RNAV routes, (c) denied the City's request to modify the routes, and (d) denied the City's requests to reinitiate consultation with the City under the National Historic Preservation Act (NHPA), 54 U.S.C. § 300101, *et seq.*, AD-022, and Section 4(f) of the Department of Transportation Act (DOT Act), 49 U.S.C. § 303(c), AD-009?

2)      Did FAA violate the NHPA by (a) issuing an unsupported Finding of No Adverse Effect, (b) not conducting consultation with the City Historic Preservation Officer, and (c) not reinitiating consultation in light of new information showing significant noise impacts from the routes on historic properties?

3)      Did FAA violate Section 4(f) of the DOT Act by (a) not consulting with the City on the routes' effects on Section 4(f) resources, (b) arbitrarily determining that the routes' noise would not impair the City's Section 4(f) resources, and (c) failing to evaluate alternatives that would avoid or minimize harm to Section 4(f) resources?

4)      Did FAA violate FAA Order 7100.41 and the Administrative Procedure Act (APA), 5 U.S.C. § 706, AD-004, by excluding the City from the

Performance Based Navigation Working Group and failing to address the City's information showing noise impacts?

5)     Did FAA violate NEPA by relying on a categorical exclusion for the RNAV routes under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321, *et seq.*?

## STATEMENT OF CASE

This case involves FAA's arbitrary implementation of 14 flight tracks at the Airport, known as RNAV routes, that changed decades-old flight corridors.  *See* Joint Deferred Appendix (JA)-620.  FAA's determination that the routes would not have significant environmental impacts was based on unsupported assumptions, and without required consultation with City historic preservation and parks officials regarding the impacts.  As a result of FAA's decision not to consult, the routes have had a profound impact on the City's historic properties, parks, and residents.

FAA admitted that it did not anticipate the impacts of the routes (JA-763) and, since beginning their use, assured the City it would address the noise impacts. JA-750.  However, FAA's assurances were empty; FAA strung along the City for nine months following the initial implementation.  In June 2016, it became clear that FAA had ignored the City's information on the routes' impacts and would not grant the City's requests to address the impacts of the RNAV routes.  JA-1109.

The NHPA, Section 4(f), and NEPA required FAA to assess whether the flight paths would cause increases in noise that would adversely affect historic properties and parks protected by the NHPA and Section 4(f).  FAA failed to meet those obligations.  It did not consult with the City regarding protected parks and historic sites and failed to conduct resource-specific analyses to assess impacts.  Instead, FAA relied on unsupported, *a priori* assumptions that led it to understate the impacts of the RNAV routes.

Almost immediately after FAA's first use of the RNAV routes on September 18, 2014, FAA's errors became apparent.  Noise complaints rose dramatically, over 2,900 percent.  *See* JA-813.  Noise from the RNAV routes disrupted historic properties and parks that FAA had concluded would not be affected.  The effect on historic properties was so severe that the State Historic Preservation Officer (SHPO) rescinded its previous concurrence with FAA's Finding of No Adverse Effect and demanded that FAA reopen consultation under NHPA.  JA-617.

After the initial implementation, FAA admitted inadequacies in its environmental analysis.  And, FAA repeatedly assured the City that it would address noise concerns.  FAA reinstituted a Performance Based Navigation (PBN) Working Group to reevaluate the RNAV procedures.  JA-750.  The City submitted extensive analytical information demonstrating the effects the RNAV procedures were having on people, historic sites, and parks.  JA-760; JA-812.  The City

4

proposed alternatives to address those impacts and requested that FAA modify the RNAV routes and conduct adequate environmental review.  *See id.*

Despite its promises, FAA disregarded the City's detailed information, did not involve the City in the Working Group's consideration of RNAV procedures, and did not reconsider its inadequate environmental analysis.  On June 1, 2015, FAA issued the June Letter, making clear that it would not return to pre-September 2014 routes, perform additional environmental review under NEPA, or reinitiate consultation under the NHPA and Section 4(f).  JA-1109.  The City filed its petition for review on the same day.

## STATEMENT OF LAW AND FACTS

### I.     Legal Framework

#### A.     FAA Order 7100.41

FAA implemented the RNAV routes pursuant to FAA Orders 7100.9, *Standard Terminal Arrival Program and Procedures*, and 7100.41, AD-075, *Performance-Based Navigation Implementation Process*, which set forth procedures for implementation of new routes.  JA-1044.[5]

Order 7100.41 requires a five-phase implementation process for RNAV routes—including:  (1) preliminary activities, (2) development, (3) operational

---

[5] FAA began development of the routes in 2012 under Order 7100.9.  JA-1044.  On April 3, 2014, Order 7100.41 superseded Order 7100.9 and the post-implementation process was conducted under Order 7100.41.  *Id.*

preparations, (4) implementation, and (5) post-implementation and evaluation. Order 7100.41 at 2-1, AD-078. FAA decides whether the "proposed procedures or routes comply with Categorical Exclusion . . . criteria" in Phase 2. *Id*. at 2-11, AD-088. A PBN Working Group "develop[s] and implement[s] PBN procedures and routes that upon effective establishment meet agreed-upon project goals." *Id*. at 1-1, AD-077. Airport operators *must* be included as a member of the Working Group to provide "input on procedure and route design, including any potential operational or environmental impacts to the airport and surrounding communities." *Id*. at A-5, AD-101.

The 7100.41 process does not end when the routes are first used in Phase 4. Phase 5 provides for "post-implementation monitoring and evaluation" (*id.* at 2-1, AD-078), which requires completion of a "Post-Implementation Assessment Report," possible modifications, and closing of the project. *Id*. at 2-17, AD-094. During Phase 5, the Working Group gathers data and recommends improvements to the procedures. *Id*. at 2-18, AD-095.

### B.    National Historic Preservation Act

Congress passed the NHPA to protect historic buildings and districts. 54 U.S.C. § 300101(5), AD-022. Under the NHPA, a Federal agency having jurisdiction over a proposed "undertaking" shall "take into account the effect of the undertaking on any historic property." *Id*. § 306108, AD-023.

6

NHPA regulations require agencies, in consultation with the SHPO and other parties, to identify the project's "area of potential effect," locate all historic properties in that area eligible for listing on the National Register, and assess the effect of the undertaking on those properties. *See* 36 C.F.R. §§ 800.4(a)–(c), 800.5, AD-033–035, 037–041. Agencies must "[s]eek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties." *Id*. § 800.4(a)(3), AD-033. The agency must consult with and consider the views of local governments with jurisdiction over the properties. *Id*. § 800.2(c)(3), AD-029.

An "adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id*. § 800.5(a)(1), AD-038. Criteria for an adverse effect include the "[i]ntroduction of . . . audible elements that diminish the integrity of the property's significant historic features." *Id*. § 800.5(a)(2)(v), AD-038.

If an agency proposes a finding of "no adverse effect", it must "notify all consulting parties . . . and make the documentation available for public inspection prior to approving the undertaking." *Id*. § 800.4(d)(1), AD-035–036. Consulting

parties have 30 days to review the finding. *Id.* § 800.5(c), AD-039–041. If the SHPO or other consulting party disagrees, the agency must either consult with the disagreeing party or request that the Advisory Council on Historic Preservation review the finding. *Id.* § 800.5(c)(2)(i), AD-039.

If historic properties would experience adverse effects, the agency must consult with the Advisory Council, SHPO, and others to "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects . . . ." *Id.* § 800.6(a), AD-041. NHPA regulations require agencies to reinitiate consultation if presented with new information that shows adverse effects after the initiation of the federal action. *Id.* § 800.13(b)(1), AD-047.

### C.      Section 4(f) of the Department of Transportation Act

Section 4(f) allows FAA to approve a project "requiring the use of publicly owned land of a public park . . . or land of an historic site of national, State, or local significance . . . only if—(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm . . . resulting from the use." 49 U.S.C. § 303(c), AD-009. "[N]oise that is inconsistent with a parcel of land's continuing to serve its recreational, refuge, or historical purpose is a 'use' of that land." *City of Grapevine v. Dept. of Transp.*, 17 F.3d 1502, 1507 (D.C. Cir. 1994).

8

FAA Order 1050.1E—which provides FAA's procedures for implementing NEPA, NHPA, and Section 4(f)—mandates that FAA "must consult all appropriate Federal, State, and local officials having jurisdiction over the affected section 4(f) resources when determining whether project-related noise impacts would substantially impair the resources."  Order 1050.1E app. A ¶ 6.2e, AD-072.

### D.     National Environmental Policy Act

NEPA requires agencies to "consider every significant aspect of the environmental impact of a proposed action." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).  Agencies must take a "hard look" at the environmental consequences and alternatives of a proposed action.  *Id.*; 42 U.S.C. § 4332(2)(C),  AD-006.   Environmental effects are usually evaluated in environmental assessments (EAs) or environmental impact statements (EISs).  *See* 40 C.F.R. § 1501.2–.4, AD-052–054.

However, NEPA regulations allow agencies to categorically exclude certain types of activities from more detailed EA or EIS review.  Categorical exclusions are "category[ies] of actions which do not individually or cumulatively have a significant effect on the human environment . . . ." *Id.* § 1508.4, AD-057.  NEPA regulations prohibit an agency from using a categorical exclusion if there are "extraordinary circumstances in which a normally excluded action may have a

9

significant environmental effect." *Id.* If extraordinary circumstances exist, agencies must prepare an EA or EIS.

Congress has permitted FAA to use categorical exclusions for certain RNAV routes, but preserved the "extraordinary circumstances" exception. FAA Modernization Reform Act of 2012, Pub. L. No. 112-95, § 213(c)(1), 126 Stat. 11, 49, AD-020. Extraordinary circumstances exist when a proposed action has (1) an "adverse effect" on NHPA properties or (2) an "impact on properties protected by Section 4(f)." Order 1050.1E ¶¶ 304a, 304b, AD-069.[6] Extraordinary circumstances also exist if the effects are "likely to be highly controversial on environmental grounds," considering opposition by local governments and the number of persons affected. *Id.* ¶ 304i, AD-070.

Under Order 1050.1E, a significant noise impact normally exists where "the proposed action will cause noise sensitive areas to experience an increase in noise of DNL 1.5 [decibels (dB)] or more at or above DNL 65 dB noise exposure when compared to the no action alternative for the same timeframe."[7] *Id.* app. A ¶ 14.3, AD-074. However, FAA must give "special consideration" when evaluating the "significance of noise impacts on noise sensitive areas within national parks,

---

[6] FAA conducted its NEPA analysis under Order 1050.1E, which was superceded by 1050.1F after the June Letter.

[7] "DNL" is the "day/night average sound level" and a metric used by FAA to reflect noise exposure. JA-333.

national wildlife refuges and historic sites . . . ." *Id*.  Noise levels below DNL 65

constitute a significant impact or adverse effect where quiet is a critical attribute of

or contributing element to historic status.  *See id.* app. A ¶ 6.2h, AD-072–073.

FAA recognizes that the DNL 65 threshold may not sufficiently protect historic

sites where "a quiet setting is a generally recognized purpose and attribute." *Id*.

## II.     Factual Background

### A.     Airport Operations and Airspace.

Phoenix Sky Harbor International Airport is the 9th busiest airport (in

passengers) in the United States, with 1,200 aircraft arriving and departing every

day.[8]  The Airport is located near downtown Phoenix and has three parallel

runways aligned east-west.  Because the Airport's runway configuration has been

set for decades, the City has worked with FAA to reduce noise impacts by planning

flight paths that follow the "Salt River corridor over areas the City has planned for

industrial and agricultural uses to maximize land use compatibility."  JA-1104.

The City implemented zoning rules to keep noise-sensitive uses away from these

corridors.  *Id.*  The City and FAA also invested hundreds of millions of dollars to

acquire the most noise-affected homes and provide sound insulation to homes

under the historic paths. *Id*.

---

[8] *See* http://www.airport-phx.com/ (last visited on May 13, 2016).

**B.    Environmental Review of the RNAV Routes.**

In 2012, FAA began to develop new RNAV routes in Phoenix. JA-1044. FAA's environmental review relied on an internal Initial Environmental Review (Initial Review) issued on September 9, 2013. JA-351. FAA considers an increase of 5 dB or more in an area between DNL 45–60 dB as indicating potential for extraordinary circumstances. JA-333.

FAA identified two areas in Phoenix that would experience substantial noise increases of DNL 5 dB or more within the DNL 45–60 dB contours due to shifting routes. JA-362; JA-401. FAA determined that these areas included 25 historic districts and properties protected under the NHPA and 19 parks protected under Section 4(f). JA-365. Despite those findings, FAA found that "there are no noise-sensitive land uses which would experience a significant noise impact . . . as a result of the implementation of the proposed procedures." JA-367. FAA adopted the Initial Review and issued a categorical exclusion in September 2013. JA-348.

**NHPA Properties.** FAA made a Finding of No Adverse Effect for the NHPA properties, asserting that the historic properties were "not associated with quiet as a recognized attribute due to the surrounding land use" and "aircraft have historically flown over these areas." JA-365. The only information FAA provided to support these conclusions were a simple list of the properties and aerial photographs of large areas of the City. *See* JA-363; JA-401–405.

12

In August 2013, FAA sought the SHPO's concurrence with its Finding of No Adverse Effect. JA-332. FAA explained to the SHPO that there were two areas in which there would be an increase of 5.0 dB or more within the DNL 45–60 dB contours. JA-333. However, FAA stated that the "proposed action is determined not to disrupt conversation and is no louder than the background noise of a commercial area." JA-334. Thus, FAA concluded that it was "not necessary to determine all [NHPA] listed and eligible properties within" the area of potential effect and that the RNAV routes would not adversely affect NHPA properties. *Id.* Relying on FAA's representations, the SHPO concurred with FAA's Finding of No Adverse Effect. JA-346. FAA did not notify the City Historic Preservation Office of its proposed finding. JA-521.

**Section 4(f).** FAA determined that 19 public parks protected by Section 4(f) in the area of impact would experience large noise increases, but would not experience any "significant adverse effect." JA-365. FAA concluded that "these parks already experience overflights and that none of these parks have quiet as an expected attribute . . . ." *Id.* FAA did not provide information on the individual parks aside from their names, including any bases for its determination that none of the parks relied on quiet as an attribute. *See id.* FAA also did not consult with the City's Historic Preservation Officer or Parks and Recreation Department to obtain information on Section 4(f) properties.

13

**NEPA.**  FAA asserted that, because the two areas of potential impact are located on "main transportation corridors through central Phoenix," the RNAV routes "are not likely to be highly controversial on environmental grounds, given the location and degree of noise increase."  JA-367.

FAA stated in its Initial Review that the City's Aviation Department supported the RNAV routes and Airport staff was involved in "design meetings for the procedures and their concerns have been considered and resolved."  JA-364. FAA later revised this determination after initial implementation, stating that "[b]y the time the environmental analysis on the proposed procedures began in 2013, no concerns were expressed by the City of Phoenix regarding the proposed procedures."  JA-613.  FAA's sole point of contact with the City on this issue was a low-level employee at the Aviation Department.  JA-1115.  FAA did not provide Airport management with the Initial Review and categorical exclusion until September 17, 2014, the day before it began using the routes.  JA-615.  Airport management requested that FAA delay implementation to make the public aware of the route changes.  JA-771.  FAA did not grant the request.

## C.    There Were Immediate Impacts from the RNAV Routes.

On September 18, 2014, FAA began using the RNAV routes.  JA-433.  Two busy routes overfly historic and residential areas of the City that had not previously experienced aircraft noise.  The immediate impact was severe northwest of the

14

Airport in an area containing a large concentration of NHPA properties, as well as in residential areas southwest of the Airport.  JA-401; JA-764.  The noise from the routes impaired the City's historic districts and properties that "depend on quiet and use of the outdoors as part of their historic attributes" and "revolve around the use of outdoor space and the integration of the indoor and outdoor realms . . . ." JA-779.

The impact of the RNAV routes can be seen by comparing before and after flight tracks.  Below is a map from FAA's "Departures - Initial Analysis," prepared a week after starting use of the RNAV routes, showing westbound departures for September 15 and 16, 2014, just before FAA began using the routes, when all jets flew for about nine miles west before turning north.  JA-528.  This nine-mile corridor includes the Salt River industrial and agricultural areas.  JA-1104.  The yellow area is FAA's predicted area of potential impact, the green lines show the actual aircraft flight tracks (from radar), and the red line shows the new RNAV route.  JA-528.  The "only aircraft that [previously] traveled over the yellow [potential impact area] were prop aircraft."  *Id*.

15



The RNAV routes changed western departures so that aircraft traveled only three miles before turning northwest along the City's downtown historic districts. JA-529. FAA's map below shows the aircraft using new RNAV tracks in red on September 22 and 23, 2014, and the pre-RNAV tracks from September 15–16 in green. FAA estimated that the new routes increased air traffic over the area of potential impact by 300%; 85% of the "[a]ircraft crossing the noise complaint area" were jets. *Id.*

16



FAA acknowledged a surge of complaints in the area of predicted 5+ dB increases. *See* JA-527. Complaints about noise from the routes escalated dramatically. In the seven months after initial implementation, the Airport received 6,342 noise complaints, an increase of almost 2,900% over the 221 complaints for all 2013. JA-813.

### D.    FAA Informs the City that It Would Address the Noise Problems.

Starting in October 2014, including a public meeting on October 16, FAA acknowledged that there were more impacts than it had expected and that aircraft were using the procedures differently than it had assumed. JA-771; JA-607.

17

Regional Administrator Glen Martin told the City FAA was considering the City's concerns about noise and would "respond to the Phoenix Aviation Department in approximately 30 days." JA-539; JA-609.

On November 14, 2014, FAA provided an update regarding noise impacts. Mr. Martin stated that, since the October 16 meeting, FAA had "received additional feedback from residents, community leaders and elected officials." JA-609. He informed the City that FAA had already made unspecified changes to the RNAV procedures to correct flights that were not following the new routes. *See id*. FAA also stated it would consider other measures to address impacts and "[i]n partnership with the Phoenix Department of Aviation, the FAA is planning to conduct additional public outreach in the near future to share technical information and achieve common understanding of potential changes." *Id*.

On November 14, 2014, FAA issued an Errata to the Initial Review in which FAA replaced its original determination that City "concerns have been considered and resolved" with the statement that "[b]y the time the environmental analysis on the [RNAV routes] began in 2013, no concerns were expressed by the City . . . ." JA-613. FAA's Errata did not reconsider its determination that the routes would not cause significant impacts.

18

### E. FAA Admits Its Analysis Was Deficient; SHPO Rescinds Its Concurrence.

FAA's unspecified RNAV modifications in November 2014 did not resolve the noise impacts. As the City informed Regional Administrator Martin on December 3, 2014, "[c]ommunity concern about overflight noise remains quite high" and the City continued to "receive record numbers of noise complaints . . . ." JA-615.

On December 12, the SHPO rescinded its concurrence with FAA's Finding of No Adverse Effect. JA-617. The SHPO informed FAA that it "ha[d] been made aware of considerable concern by residents of local historic districts within the flight path[s'] area of potential effect that the level of noise has become detrimental to the quality of life within these areas." *Id*. The SHPO formally requested reinitiation of consultation under the NHPA based on the new information and asked that "FAA study the effects of the new noise pattern in cooperation with the City of Phoenix, representatives of residents of the affected areas, and any other interested parties appropriate for consultation under [NHPA regulations]." *Id*.

FAA acknowledged its deficient analysis. At a December 16, 2014, City Council meeting, Regional Administrator Martin admitted: "I think it's clear that based on what I have heard from your communities, [FAA's procedures were] probably not enough because we didn't anticipate this being as significant an

19

impact as it has been, so I'm certainly not here to tell you that we've done everything right and everything we should have done . . . ."  JA-773 (emphasis omitted).

On December 23, 2015, City Manager Ed Zuercher wrote to FAA Administrator Michael Huerta stating that FAA did not anticipate the impacts "because there was no appropriate outreach made to the City or Community to explain the potential effects of the RNAV flight paths."  JA-619.  He requested reopening NHPA consultation and informed FAA that the City was collecting information on the noise impacts.    JA-620.   The City requested that FAA "discontinue implementation of the new RNAV flight paths until completion of a jointly designed and implemented local public outreach process . . . ."  *Id.*

## F.     FAA Reestablished a Working Group to "Explore Potential Adjustments to the Procedures to Better Manage Noise Issues."

On January 22, 2015, Administrator Huerta informed the City that FAA would not revert to the pre-RNAV routes, but was "committed to exploring possible adjustments to the new procedures . . . ."   JA-750.    Apparently implementing FAA's promise of involving the City in solving the noise problem, Administrator Huerta told the City that FAA would reconvene a PBN Working Group in February 2015 and the City would be "an important player" in it.  *Id.* Administrator Huerta did not respond to the City's requests to reinitiate consultation regarding impacts to historic properties.  *Id.*

20

On January 29, 2015, Regional Administrator Martin responded to the SHPO's letter rescinding its NHPA concurrence.  JA-752.  He did not discuss the impacts to historic properties that the SHPO contended required reinitiation or the regulation providing for reinitiation; but simply stated that FAA "concluded the Section 106 process for this undertaking" in 2013.  *Id*.  Mr. Martin pledged that FAA would work with the City to "continue to explore other potential adjustments to the procedures to better manage noise issues."  *Id*.

### G.     The City Provided Substantial Information on the Impact of the RNAV Routes.

On February 17, 2015, in support of the PBN Working Group process, the City submitted over 10,000 pages of comments and information to demonstrate how the RNAV routes affected the City's parks, historic properties, and neighborhoods.  JA-760.  The City renewed its request that FAA reopen NHPA consultation and conduct an environmental review of the routes to comply with the NHPA, Section 4(f), and NEPA.  JA-768.  City Historic Preservation Officer Michelle Dodds stated that "[f]ifteen of the City's historic residential districts have been adversely affected by the noise, vibrations, and visual intrusions resulting from a dramatic increase in the number of airplanes flying at low altitudes directly over or near these neighborhoods."  JA-754.  She found that the RNAV routes "have diminished the integrity of setting in these historic districts by affecting the use of some of the important character-defining features that historically promoted

21

outdoor living and neighborhood walkability . . . ." JA-757. Ms. Dodds also noted that the areas FAA had assumed previously experienced commercial-area noise levels were "overwhelmingly residential in nature." JA-756–57. She also reiterated SHPO concerns with the routes' "secondary adverse effects to these properties beginning with the loss of original, [historic] windows in order to control noise levels." *See* JA-757; *see also* JA-622. The City informed FAA that residents of historic neighborhoods were exploring the replacement of historic windows to reduce noise in their homes (JA-780–82), and requested that FAA reinitiate NHPA consultation on the basis of this new information. JA-768.

On April 7, 2015, the City supplemented its February letter, providing FAA with additional detailed data on noise impacts based on new noise monitoring. JA-814. That data confirmed that "FAA's assertions to [the] SHPO were incorrect that the noise from the RNAV [routes] would not be audible above background noise levels or interfere with speech." *Id*. "FAA's assumption—and representation to the SHPO—that the Phoenix historic neighborhoods had ambient levels equivalent to a commercial area (over 65 decibels on average) exaggerated actual ambient noise levels in these neighborhoods by 10–15+ decibels, a massive and material error." *Id*. The City also used FAA's modeling tools to show that almost 38,000 more residents were exposed to levels of noise high enough to disrupt speech than existed prior to the routes. JA-819. The City called on FAA to

consider the newly-supplied information in its "evaluation of Phoenix's pending requests to (a) reinitiate consultation under . . . the NHPA, (b) consider impacts during its current analysis of possible modifications to the September 18, 2014, RNAV routes, and (c) conduct further NEPA review."  JA-812.

### H.    FAA's June Letter Concluded the RNAV Implementation Process.

On April 14, 2015, FAA sent the City a letter (April Letter) and an attached Post-Implementation Assessment Report (Final Report) purporting to conclude the PBN Working Group's work.  JA-1036.  In the Final Report, the Working Group evaluated potential alternative route designs and developed procedural amendments to certain RNAV routes.  JA-1071.  Also, FAA concluded that there was no need to change its categorical exclusion.  *Id*.  In the April Letter, FAA claimed that the City had not "offer[ed] its own ideas or suggestions" regarding the alternatives that the Working Group considered.  JA-1036.  FAA invited the City to "provide input about specific measures you would like us to consider and analyze" and indicated that FAA would consider additional modifications to the RNAV routes.  *Id*.  FAA asserted that it "continue[d] to support a collaborative approach towards addressing the community's concerns with the new procedures . . . ."  *Id*.  The April Letter and Final Report did not address the information on impacts provided by the City in the City's February and April letters, respond to

23

City requests for consultation under the NHPA and Section 4(f), or provide consistent reasons for dismissing the City's preferred alternatives.

The Final Report included a "Scoping Document" outlining the process and objectives of the PBN Working Group's post-implementation assessment. JA-1077. The Scoping Document indicated that the alternatives FAA proposed and considered were *not intended to address noise impacts*. JA-1078. Rather, despite the Administrator's assurances, the Working Group was tasked only with analyzing modifications to RNAV routes that related to safety, efficiency, and procedural conformance with intended paths. *Id*. The Scoping Document was signed on February 9, 2015, and did not list the City as a member of the Working Group. *Id*. FAA did not involve the City in determining alternatives to the RNAV routes or considering route design, and the City's involvement in the Working Group was limited to two initial meetings in February 2015. JA-1093–94. FAA subsequently excluded the City from all other meetings.

The City responded to FAA's April Letter and Final Report on April 24, 2015. JA-1102; JA-1090. It noted Administrator Huerta's statement that the City had been invited onto the Working Group to "explore [] potential adjustments to the procedures to better manage noise issues." JA-1102. However, based on the Final Report, it appeared that "FAA structured the PBN Working Group so that it would not provide noise relief which Administrator Huerta promised . . . ." *Id*.

24

FAA further "excluded the City from PBN Working Group meetings in which alternatives were developed and evaluated." *Id*. The City also pointed out that it *had* offered meaningful alternatives to FAA, which would have "retain[ed] almost all of the benefits of FAA's RNAV package" and "greatly reduce[d] the number of persons exposed to noise levels high enough to interfere with conversations and other communication." JA-1103.

The City demanded that FAA commit to evaluate in an EA the "noise, historic, park and other effects of the September 18 routes and possible alternatives." JA-1105. The City also submitted comments detailing the benefits of the City's alternatives and showing that the two FAA RNAV routes causing the most noise impact "expose[] 68% more people to noise on a per flight basis than the City's proposed RNAV route . . . ." JA-1095.

FAA responded to the City on June 1, 2015, making clear that it would not adopt the City's alternatives. JA-1109. In the June Letter, FAA stated that unspecified short-term adjustments could be completed in six months and that it would "explore" adjustments in the longer term that would take another year to complete. JA-1109–10. FAA did not disclose a process by which those adjustments would be explored, did not address the City's concerns over the Final Report's lack of alternatives to address noise impacts, and did not address the City's requests to reinitiate NHPA consultation.

## SUMMARY OF ARGUMENT

From beginning to end, FAA's RNAV process bore no resemblance to normal agency action under the NHPA, Section 4(f), NEPA, or the APA. FAA made profound changes in the airspace over Phoenix that rerouted long-settled flight tracks over parks, historic areas, and neighborhoods that had not previously experienced such activity levels. It did so with no notice to the public and none of the consultation with City park and historic officials required by law. It supplied inadequate and misleading information to the SHPO in order to secure its concurrence that there were no historic impacts. It decided that no careful, public environmental or historic reviews were needed based on incorrect assumptions unsupported in the record.

The City and the SHPO identified these shortcomings after the RNAV routes were being used and supplied evidence regarding the extensive effects on historic resources, parks and people. FAA acknowledged the inadequacies of its process and environmental consequences, and it promised to work with the City to address the problems. Accordingly, the City supplied extensive technical information to FAA regarding environmental effects and possible solutions. However, FAA disregarded this information, summarily reaffirmed its environmental analysis in the Final Report, and ignored requests to reinitiate consultation. Further, FAA shut the City out of its mandatory process under Order 7100.41 and concealed the fact

26

until after the process was concluded.  FAA did not disclose until after fact that the PBN Working Group's charter *excluded* the consideration of noise or any substantial route changes that would have addressed impacts.  FAA's disregard of the facts, governing regulations, and the public are a textbook case of arbitrary and capricious action.

As a result, the City seeks an order vacating and remanding to FAA its decision to implement the RNAV routes for the following reasons:

1)     **Final Order.**  The June Letter completed FAA's administrative process for RNAV implementation.  FAA's initial implementation of the routes in September 2014 did not conclude FAA's administrative process under Order 7100.41.  Following the initial implementation, FAA acknowledged that the noise impacts were more significant than FAA had anticipated and repeatedly assured the City that it would address the City's noise concerns and include the City in a process to adjust the routes.  It was not until FAA's June Letter that FAA made clear that it would not conduct required environmental review.

2)     **NHPA.**  FAA violated mandatory duties under the NHPA when it failed to consult with the City as the local government with jurisdiction over the affected historic properties.   36 C.F.R. § 800.2(c)(3), AD-029.   FAA further violated the NHPA when it did not reinitiate consultation with the City and SHPO

27

after they provided new information showing adverse effects and fundamental errors in FAA's initial analysis. *See* 36 C.F.R. § 800.13(b), AD-047.

3)    **Section 4(f).**  FAA violated Section 4(f) by failing to consult with the City regarding noise impacts on City parks and historic resources protected by Section 4(f).  49 U.S.C. § 303(c), AD-009.  FAA's determination that the RNAV routes would not substantially impair Section 4(f) resources relied on incorrect assumptions and was not factually supported.

4)    **Order 7100.41.**  FAA violated Order 7100.41 and the APA by excluding the City from the PBN Working Group's post-implementation process.

5)    **NEPA.**  FAA violated NEPA by improperly relying on the categorical exclusion when extraordinary circumstances were present.  Order 1050.1E ¶ 304i, AD-070.

## STANDING OF CITY OF PHOENIX

Under Circuit Rule 28(a)(7), the City has standing to bring this action because FAA's unlawful decision to implement RNAV routes continues to adversely affect the City.  To establish standing, the City must show that (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely that the injury will be redressed by a favorable decision.  *D&F Afonso Realty Trust v. FAA*, 216 F.3d 1191, 1194 (D.C.

28

Cir. 2000).  A city has standing to sue a federal agency "when a harm to the city itself has been alleged."  *City of Olmstead Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002).

### A.    The City Continues to Suffer Concrete Injuries.

The City has suffered procedural injuries from FAA's action.  "To establish injury-in-fact in a 'procedural injury' case, petitioners must show that 'the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff.'"  *City of Dania Beach v. FAA*, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (citation omitted).  FAA's implementation of the RNAV routes has caused noise impacts that affect the City's particularized interests.

First, FAA's implementation of the RNAV routes adversely affects the City's proprietary interest in managing the noise impacts of its Airport.  *See Di Perri v. Federal Aviation Admin.*, 671 F.2d 54, 58 (1st Cir. 1982) ("The FAA itself has steadfastly maintained that the local proprietor has primary responsibility for the regulation of airport noise.").  The City has "worked for decades . . . to promote compatible land uses, purchase the most noise affected properties and insulate homes to reduce noise impacts."  JA-1104; JA-1098; *see also City of Las Vegas v. FAA*, 570 F.3d 1109, 1114 (9th Cir. 2009) (injury to city where flight tracks impaired environmental and land use interests).

29

Second, FAA's action adversely affects the City's interests in protecting its historic resources.  *See City of Jersey City v. CONRAIL*, 668 F.3d 741, 744–46 (D.C. Cir. 2012) (harm to City's "historic and environmental interest" due to NEPA and NHPA violations).  The City expends substantial resources and exercises its powers to protect its aesthetic and historical character.  JA-624.  The City's interest in managing its historic properties is explicitly recognized in the NHPA regulations requiring consultation with local governments with jurisdiction over affected areas.  36 C.F.R. § 800.2(c)(3), AD-029.

The RNAV routes also harm the City's direct interest in the parks that it owns for which quiet is a fundamental attribute, such for as outdoor music and theater uses.  *See* JA-804.

### B.    The City's Injuries Are the Result of FAA's RNAV Routes and Are Redressable.

The City must demonstrate a causal connection between FAA's action and its injuries.  *See Dania Beach*, 485 F.3d at 1186.  Here, FAA's decision to implement the RNAV routes over its parks, historic districts and neighborhoods caused the City's injuries.  JA-773.

These injuries would be redressed by a favorable ruling that invalidates FAA's decision and requires FAA to follow proper environmental procedures, including consultation, adequate evaluation of the routes' impacts, and measures to minimize impacts.

## STANDARD OF REVIEW

This Court reviews the "decisions of federal agencies, including the FAA, under the standards set forth by the [APA]." *D&F Afonso Realty*, 216 F.3d at 1194. A court must set aside an agency action if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D), AD-005.

An agency's action is arbitrary and capricious if, among other things, it is "'not supported by substantial evidence' in the record as a whole." *See BFI Waste Sys. of N. Am. v. FAA*, 293 F.3d 527, 532 (D.C. Cir. 2002) (citation omitted); *see also* 49 U.S.C. § 46110(c), AD-014. An agency action is arbitrary and capricious if: (1) the decision does not rely on the factors that Congress intended it to consider; (2) the agency failed entirely to consider an important aspect of the problem; or (3) the agency offers an explanation which runs counter to the evidence. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

31

## ARGUMENT

### I.    THE CITY'S PETITION IS TIMELY UNDER 49 U.S.C. § 46110.

#### A.    The June Letter Is a Final Order that Marked the Conclusion of FAA's RNAV Route Implementation Process.

An "order" is "the whole or a part of a final disposition . . . of an agency in a matter other than rule making . . . ."  5 U.S.C. § 551(6), AD-001.  "To be deemed 'final' and thus reviewable as an order under 49 U.S.C. § 46110, an agency disposition 'must mark the consummation of the agency's decisionmaking process,' and it 'must determine rights or obligations' or give rise to legal consequences.'"  *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 598 (D.C. Cir. 2007) (quoting *Dania Beach*, 485 F.3d at 1187).  The term "order" in § 46110 "should be read 'expansively.'"  *Dania Beach*, 485 F.3d at 1187.  Under § 46110, "an 'order' must be final, but need not be a *formal* order, the product of a *formal decision-making process*, or be issued personally by the Administrator."  *Aerosource, Inc. v. Slater*, 142 F.3d 572, 578 (3d Cir. 1998) (emphasis added).  The "core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

FAA's position is that the routes' initial implementation on September 18, 2014, is FAA's only "order" and that the City must have filed its petition for review within 60 days after that.  *See* FAA Motion to Dismiss at 1 (Doc. No.

1563118).  FAA's position is wrong, because it ignores (1) FAA's own procedures for developing and finalizing RNAV routes (Order 7100.41 at 2-17, AD-094) *and* (2) FAA's repeated promises that it would explore changes to the RNAV routes in light of community impacts, including reconvening the PBN Working Group to "explore other potential adjustments to the procedures to better manage noise issues" as part of the final assessment phase.  JA-750.

The decisionmaking process under Order 7100.41 does not end when aircraft first begin to fly an RNAV procedure, as FAA has asserted.  The 7100.41 process extends *past* the initial implementation date to include a post-implementation evaluation phase culminating in the release of a final report and final routes.  That phase is intended to keep FAA's decisionmaking process *open* to allow FAA to make changes to the RNAV procedures based on information learned after the initial implementation.  Order 7100.41 at 2-16–2-19.

That is exactly what was supposed to happen here.  After initial implementation, the City, SHPO, and others informed FAA of the enormous unanticipated impacts of the new RNAV routes.  *Supra* at 21–23.  FAA responded by promising that it would address those concerns, including consideration of changes to the RNAV routes.  And, FAA continued to make changes to its procedures, showing its decisionmaking was not complete.  JA-609.  FAA reconvened its PBN Working Group to reconsider the RNAV procedures and said

33

it would include the City as a member of the body. Order 7100.41 provides that the City's "role and responsibilities" on the Working Group were to "[p]rovid[e] input on procedure and route design, including any potential operational or environmental impacts to the airport and surrounding communities." Order 7100.41 at A-5, AD-101. FAA's Order confirms that initial implementation of the RNAV routes in September 2014 was not FAA's final decision and that further changes based on environmental concerns were contemplated.

Apart from Order 7100.41, FAA itself kept the process open in Phoenix by repeatedly telling the City that FAA was evaluating changes to the RNAV routes and would address noise concerns. As detailed above, FAA repeatedly assured the City that FAA was considering changes to the RNAV procedures and invited the City to submit additional information about impacts and alternatives. *Supra* at 20–21. And, it did make changes to its routes and procedures. *Supra* at 18.

Further, as the implementation process continued, FAA was required to meet additional NHPA obligations. NHPA regulations required FAA to reinitiate consultation based on new information showing adverse impacts. *Id.* § 800.13(b)(1), AD-047. Both the SHPO and City requested that FAA reinitiate consultation based on new information, which required re-evaluating FAA's initial determination of no adverse effects to historic properties. JA-617; JA-805. Thus,

34

FAA's obligations under the NHPA were ongoing, even after initial implementation.

Even *after* the PBN Working Group issued its Final Report in April 2015, which is the last step in the Order 7100.41 process, FAA *continued* to invite the City to submit information and suggest alternative RNAV routes, showing that FAA had not ended its decisionmaking process. JA-1036. The City did so (JA-1090, JA-1102, JA-1107), and FAA did commit to changes to the routes, although the changes failed to address the City's concerns. JA-1109.

FAA's reconsideration of the routes did not end until it issued the June Letter, at which time FAA finally made clear that it would not reinitiate consultation with the City under the NHPA or Section 4(f) and would not revise its environmental analysis. At that point, and at no time before, FAA concluded its own decisionmaking and finally determined the City's rights and obligations under the NHPA, Section 4(f), and NEPA.[9] *Dania Beach*, 485 F.3d at 1187.

**B.    Even if the Court Finds that FAA's September 18, 2014, Commencement of RNAV Routes Is an Order, the 60-day Period for Filing a Petition for Review Was Tolled.**

Even if the Court accepts FAA's argument that the initial implementation of RNAV routes in September 2014 was FAA's final "order," the City's petition

---

[9] Even if the Court were to consider FAA's April Letter and Final Report to be FAA's order, the petition for review was still timely because it was filed within 60 days.

remains reviewable under 49 U.S.C. § 46110(a). A petition for review may be filed after 60 days if "there are reasonable grounds for not filing by the 60th day." 49 U.S.C. § 46110(a), AD-014. This Court has found "reasonable grounds" where a petitioner waited to file a legal challenge due to agency representations that it would address petitioner concerns. In *Paralyzed Veterans of America v. Civil Aeronautics Board*, the D.C. Circuit found that petitioners had "reasonable grounds" for waiting more than 60 days when it was "[a]ware that the rule might be undergoing modification, and unable to predict how extensive any modification would be . . . ." 752 F.2d 694, 705 n.82 (D.C. Cir. 1985), *rev'd on other grounds*, *Dep't of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597 (1986). Petitioners were reasonable in "elect[ing] to wait until the regulation was in final form before seeking review." *Id*.

Similarly, in *Safe Extensions*, this Court found that a manufacturer had reasonable grounds to delay its petition for review of an FAA advisory circular establishing requirements for its products. 509 F.3d at 602–604. In response to "significant uproar in the industry," FAA represented that it would revise the circular. *Id*. at 603. Safe Extensions allowed the 60-day petition filing period to expire "[b]ased on [FAA's] representation, and hoping to avoid litigation, the company decided to wait and see if the FAA [would] address[] the issues . . . ." *Id*. Safe Extensions had reasonable grounds for filing after 60 days. *Id*. at 604. The

36

"delay simply served properly to exhaust the petitioners' administrative remedies, and to conserve the resources of both the litigants and this court." *Id.* (quoting *Paralyzed Veterans*, 752 F.2d at 705 n.82).

Any "delay" by the City in filing its petition was the result of repeated representations by FAA that it would consider revisions to the RNAV routes to address the City's concerns. FAA's promises that it would consider revisions to address community concerns began immediately after initial implementation, well within 60 days of FAA's initial implementation. FAA told the City that it would evaluate the RNAV routes and hold a public meeting in October 2014. JA-531. At the October public meeting, FAA acknowledged that there were more impacts than it expected and told the City it was implementing changes to the routes and considering other mitigation measures. *See* JA-771. Following the public meeting, FAA notified City leaders that it was considering the City's concerns and would respond to the City "in approximately 30 days." JA-539.

On November 14, 2014, still less than 60 days after initial implementation, FAA informed the City that it already had made some modifications to the procedures and was further "teaming with the airport staff and industry experts to determine what actions or changes are possible and whether those steps could potentially mitigate the noise issues." JA-609. In January 2015, Administrator Huerta formalized those promised steps by announcing that FAA was "committed"

37

to considering measures to address the noise impacts and would reconvene the PBN Working Group.  JA-750.

The City reasonably relied on the commitment from Administrator Huerta—the most senior FAA official—to establish an administrative process in which the City could participate.  Accordingly, the City submitted extensive comments and noise impact information to FAA in February and April of 2015, including suggestions for alternative RNAV procedures.  JA-760; JA-812.

Even *after* the Working Group issued its Final Report in April 2015, FAA *continued* to invite the City to submit additional information to consider additional modifications to the RNAV routes.  JA-1036.  Again, the City relied on that promise and submitted additional information to FAA, including detailed, technical comments from the City's Aviation Department.  JA-1090; JA-1102.  The City reasonably expected that FAA would address the City's concerns and information.  In its June Letter, FAA informed the City that FAA had made further unspecified changes to the RNAV procedures.  *See* JA-1109.  Although those changes did not

38

solve the City's concerns, they underscore that FAA continued to make changes up until June 1 and that the City reasonably relied on FAA's promises.[10]

Over almost nine months, from September 18, 2014, to June 1, 2015, FAA repeatedly invited the City to participate in processes with the promise that FAA would reconsider the RNAV routes and try to address the City's concerns. The City relied on the FAA's repeated commitments and refrained from filing its petition in the reasonable expectation that FAA's ongoing consideration would address its concerns. It is disingenuous for FAA to now assert that the September 18, 2014, initial implementation date was its final order and that the City's petition is time barred.

## II. FAA's NHPA DECISIONS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND VIOLATE FAA's CONSULTATION OBLIGATIONS.

### A. FAA's Finding of No Adverse Effect Was Arbitrary and Capricious Because FAA Relied on Unsupported Assumptions.

In its Finding of No Adverse Effect, FAA identified areas where there would be an increase of noise of 5.0+ dB within the DNL 45-60 dB noise contours that included NHPA properties. JA-333. However, FAA concluded that the noise

---

[10] It is now apparent that FAA's post-September 2014 "process" was a sham intended to forestall litigation without providing any promised relief. Despite Administrator Huerta's promises, the PBN Working Group's charter *excluded* noise relief as an objective and *excluded* the City from the route design and analysis meetings that were essential to providing relief. *See supra* at 24–25.

increase did not constitute the significant impact of an increase of 1.5 dB or more at or above DNL 65 dB noise exposure. *Id*. FAA asserted to the SHPO that the RNAV routes would not "disrupt conversation and [are] no louder than the background noise of a commercial area." JA-334.

However, FAA must specifically find that noise will not have significant adverse effects on a historic property where quiet is a critical attribute of a historic property, even when aircraft noise does not rise above DNL 65. Order 1050.1E app. A ¶ 6.2i, AD-073. FAA's guidance recognizes that the DNL 65 threshold "may not be sufficient for all historic sites . . . and do[es] not adequately address the effects of noise on the expectations and purposes of people visiting areas . . . where other noise is very low and a quiet setting is a generally recognized purpose and attribute." *Id*.

Consistent with this guidance, in recent agency decisions implementing RNAV routes at other airports, FAA has determined that if there is an increase in noise below 65 DNL—especially a 5 dB increase in the 45–60 DNL—FAA will investigate further to determine if the "reportable increase would diminish the integrity of a property's setting for which the setting contributes to historical or cultural significance." JA-794 (quoting FAA's Washington, D.C. Metroplex EA). In Phoenix, FAA departed from its practice of investigating noise impacts in an EA (JA-790–92) and failed to comply with 1050.1E's requirement that it seek further

40

information on historic areas "where other noise is very low and a quiet setting is a generally recognized purpose and attribute."  Order 1050.1E app. A ¶ 6.2i, AD-073.

FAA conducted no analysis on (1) the noise levels of the City's 25 historic districts and properties without the RNAV routes or (2) the specific attributes of these districts and properties to determine whether introduction of the RNAV routes would cause adverse effects.  FAA's Finding of No Adverse Effect was based on unsupported *assertions and assumptions* about how NHPA properties might be affected by the RNAV routes.  FAA assumed, and asserted to the SHPO, that the "proposed action is determined not to disrupt conversation and is no louder than the background noise of a commercial area."  JA-334.  That conclusion is not supported by the record.  FAA conducted *no analysis or research* to support its conclusion.  Indeed, as discussed below, FAA failed to even consult with the City and its Historic Preservation Officer to gather information about whether the NHPA properties are in a location "where a quiet setting is a generally recognized purpose and attribute."  Order 1050.1E app. A ¶ 6.2h, AD-072–073.

FAA's reliance on its generic noise thresholds for non-historic areas in making a Finding of No Adverse Effect, without any other information on the ambient noise levels of the City's historic properties, was arbitrary and capricious. *See Safe Extensions*, 509 F.3d at 605 ("FAA has provided absolutely no evidence

41

to back [its conclusion] up, and . . . an agency's declaration of fact that is capable of exact proof but is unsupported by any evidence is insufficient to make the agency's decision making non-arbitrary.") (internal citation and quotation marks omitted).  "[M]ere perfunctory or conclusory language will not be deemed to constitute an adequate record."  *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 770 F. 2d 423, 434, 436 (5th Cir. 1984) (agencies "never considered *any* of the consequences—noise, visual, aesthetic, traffic, or otherwise—the project would have on any of the historic buildings").  FAA's failure to even attempt to gather the information necessary to support its decision is the very definition of arbitrary and capricious decisionmaking.  *See Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1142 (9th Cir. 2008) ("We cannot defer to a void" in record.).

### B.     FAA Failed to Consult with the City Under the NHPA.

FAA's failure to consider how noise would affect historic properties flows from its disregard of NHPA requirements that FAA consult with "[a] representative of a local government with jurisdiction over the area" who is "entitled to participate as a consulting party."  36 C.F.R. § 800.2(c)(3), AD-029; *id.* § 800.4(a)(3), AD-033.  By not consulting with the City Historic Preservation Officer, FAA also failed to notify "all consulting parties" and "make its

documentation available" regarding its Finding of No Adverse Effect. *Id*. § 800.4(d)(1), AD-035–036.

FAA's environmental review order provides that the "SHPO . . . and other appropriate sources *must* be consulted for advice early in the environmental process . . . ." Order 1050.1E app. A ¶ 11.2, AD-074. FAA's Section 106 Handbook (Oct. 2014)[11] emphasizes consultation with local governments:

> "Consultation is at the heart of the Section 106 process . . . . FAA must consult with [the SHPO] . . . and other individuals or organizations with a special interest in the undertaking or in the historic properties that may be affected by the undertaking." JA-554.

> "Representatives of local governments with jurisdiction over the area where the undertaking may have effect are entitled to participate in the consultation process." JA-561.

The NHPA's consultation requirements were designed to prevent precisely what happened in this case: an uninformed undertaking that affects historic properties. FAA failed to consult with the City Historic Preservation Officer—the official designated with expertise on the City's historic properties, which violated the NHPA regulations and FAA's NHPA guidance. *See National Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980) ("Agencies are

---

[11] NHPA's Section 106 is now codified at 54 U.S.C. § 306108.

under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures.").

### C. FAA Failed to Reinitiate NHPA Consultation Despite New Information Demonstrating Adverse Effects on Historic Properties.

Under the NHPA, if "unanticipated effects on historic properties [are] found after the agency official has completed the section 106 process . . . , the agency official shall make reasonable efforts to avoid, minimize or mitigate adverse effects to such properties" and "consult to resolve adverse effects pursuant to § 800.6." 36 C.F.R. § 800.13(b), (b)(1), AD-047. Here, FAA failed to reinitiate consultation despite (1) extensive evidence the City supplied that the RNAV routes are causing direct and indirect adverse effects on historic properties and (2) the SHPO's rescission of its concurrence of FAA's Finding of No Adverse Effect. *Petroleum Commc'ns v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) ("where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action").

Under the NHPA, an "adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property . . . in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1), AD-038. The information before FAA made clear that the RNAV routes are adversely

44

affecting historic properties. The SHPO stated that the "level of noise has become detrimental to the quality of life within these [historic] areas." JA-617. As a result, the SHPO rescinded its NHPA concurrence and requested that FAA "reopen for consideration the question of the new flight path's effects on historic properties." *Id*. *See Citizen Advocates*, 770 F. 2d at 436 (finding of no historic impact flawed where state historic official had been supplied incorrect information).

The City also provided evidence showing that FAA's original analysis was incorrect. For example, FAA assumed that, without the RNAV routes, the affected NHPA properties were subject to the same noise level as a "commercial area." JA-334. However, the City Historic Preservation Officer demonstrated that the NHPA properties are "overwhelmingly residential in nature" (JA-756–57), and the City informed FAA that "quiet and use of the outdoors" is a critical attribute of the historic status of the relevant NHPA properties. JA-779. Further, the City showed that "it is now beyond dispute that the new RNAV procedures have a substantial adverse effect on speech and audibility in and around historic districts and properties." JA-788; JA-815 ("noise events from aircraft using the new RNAV routes are frequent and high enough to interfere with speech and be audible above ambient levels"). The City also showed that, despite FAA's assertion that the noise impact areas were in "transportation corridors" or "commercial areas", the

45

areas of impact were often at least 1.25 miles away from major surface transportation arteries, included in residential zones, and shielded from surface transportation corridors by blocks of structures. JA-801.

The City also supplied FAA with detailed data from noise monitoring it conducted at 37 sites in Phoenix to show how the noise levels compared with and without the RNAV routes. JA-814. "The noise monitoring results confirm that single event noise levels in historic neighborhoods . . . frequently and regularly exceed the threshold necessary to cause speech interference (approximately 65 decibels for normal conversation at 3 feet)." *Id.* The noise monitoring data showed that "average ambient noise levels [*i.e.*, without the RNAV noise] in the historic areas in question . . . reflect conditions equivalent to quiet suburban or urban environments (based on FAA's comparison scale it provided to the SHPO on August 2013)." *Id.* "FAA's assumption—and representation to the SHPO—that the Phoenix historic neighborhoods had ambient levels equivalent to a commercial area (over 65 decibels on average) exaggerated actual ambient noise levels in these neighborhoods by 10-15+ decibels, a massive and material error." *Id.* The City also noted inconsistencies in FAA's own analysis, in which FAA modeled the neighborhoods as "Quiet Suburbs", but characterized them as commercial urban areas to the SHPO. *Id.* n.2 (citing JA-410). FAA has never acknowledged, let alone addressed, these issues.

The City made specific recommendations for evaluating and addressing those effects:

> Detailed property-by-property evaluation will be necessary to determine the extent to which the noise events affect the historic attributes of the affected properties. Exhibit 22 contains detailed historic district information for FAA to consider in this process; the City stands ready to supply additional listing and other information . . . .

JA-788.

In addition to direct impacts, FAA also failed to consider and address *indirect* impacts associated with the replacement of historic windows in the noise-affected areas. Many of the houses in the City's historic districts have single-pane windows, which are vulnerable to noise impacts. JA-780. Noise from aircraft using the RNAV routes is entering homes through the historic windows and causing annoying rattle effects with the original windows. JA-780–81. As a result, City residents have sought to replace historic windows to address the effects of the noise caused by the routes. JA-781–82.

The replacement of windows in response to the noise caused by the RNAV routes is an indirect adverse effect under NHPA. The Secretary of the Interior's Guidelines regarding Preservation provide that: "The historic character of a property will be retained and preserved. The replacement of intact or repairable historic materials or alteration of features, spaces, and spatial relationships that

47

characterize a property will be avoided." JA-782 (quoting Guidelines). According to the Advisory Council on Historic Preservation, "[w]indow replacements are likely to adversely affect the historic building, because original windows are often character-defining features." JA-212; *see also* JA-239 (City Historic Preservation Office Guide to Window Repair: "Removing or altering historic windows could compromise the appearance of your historic building, reduce its value, and result in the loss of historic status . . . .").

The City demonstrated these indirect effects in its request to reinitiate consultation. JA-783; *see also* JA-617. Further, according to the SHPO, "[i]t is obvious . . . that the assumptions made by the FAA were incorrect and that this undertaking has the potential to cause secondary adverse effects to these properties beginning with the loss of original, [historic] windows in order to control noise levels." JA-622.

Despite the information submitted by the City and SHPO, and FAA's acknowledgement that the RNAV routes are having unanticipated effects on historic properties (JA-763), FAA refused to reopen consultation and failed to provide any explanation for that failure. FAA has made no mention or response to the window issue, historic district details or noise data. FAA violated the NHPA by failing to reinitiate consultation despite substantial evidence demonstrating that

48

its Finding of No Adverse Effect was wrong.  36 C.F.R. § 800.13(b), AD-047; *see*

*Petroleum Commc'ns*, 22 F.3d at 1172; *State Farm*, 463 U.S. at 43.

## III.  FAA VIOLATED SECTION 4(f) OF THE DOT ACT.

### A.    FAA Failed to Consult with the City on the Impacts of the RNAV Routes on Section 4(f) Resources.

As with the NHPA, FAA's order regarding Section 4(f) requires it to consult

with local governments regarding Section 4(f) resources:  the "responsible FAA

official *must consult* all appropriate Federal, State, and local officials having

jurisdiction over the affected [S]ection 4(f) resources when determining whether

project-related noise impacts would substantially impair the resources."  Order

1050.1E app. A ¶ 6.2e, AD-072 (emphasis added); *id.* app. A ¶ 6.4, AD-073 ("The

FAA shall consult with the officials having jurisdiction over the section 4(f)

propert[ies] . . . .").

FAA ignored its own requirement that it consult with City officials—the

Historic Preservation Officer and parks officials—with jurisdiction over Section

4(f) properties and made its determination of no substantial impairment in the

Initial Review without the benefit of that information.  Following the initial

implementation, FAA continued to avoid consultation with City parks or historic

officials despite an explicit request from the City and evidence demonstrating that

FAA's assumptions on the impact to Section 4(f) resources were incorrect.  In

addition to impacts on historic resources, the City provided specific information

about how the RNAV routes affect specific City parks that rely on quiet as a critical attribute. JA-804. FAA's failure to consult was arbitrary and capricious and in violation of Section 4(f) and FAA guidance. *National Conservative Political Action Comm.*, 626 F.2d at 959.

### B. FAA's Determination that the RNAV Routes Would Not Substantially Impair Section 4(f) Resources Was Arbitrary.

To comply with Section 4(f), FAA must determine which resources are protected and whether the RNAV routes would "use" those properties. 49 U.S.C. § 303(c), AD-009. If a "use" substantially impairs a Section 4(f) resource, FAA may not go forward with the project unless it satisfies Section 4(f)'s substantive requirements to minimize impacts. *Id*. Order 1050.1E app. A ¶ 6.2e, AD-072. Whether FAA complied with Section 4(f) turns on whether "the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). FAA failed to provide a sufficient basis for its determination that the RNAV routes would not substantially impair Section 4(f) resources.

Prior to the initial implementation, FAA had no information on the characteristics of 25 NHPA resources and 19 City parks impacted by the RNAV routes. FAA did not attempt to determine the actual pre-RNAV noise levels of the historic properties and parks or how the RNAV routes would affect the Section 4(f) properties. *Supra* at 13–14. FAA merely assumed that those properties would not

be impaired "[g]iven the location of these parks[,] where these parks already experience overflights and that none of these parks have quiet as an expected attribute . . . ." JA-365. FAA's assumptions were unsupported by *any* evidence or analysis and therefore arbitrary. *See Druid Hills Civic. Assoc. v. FAA,* 772 F.2d 700, 717–18 (11th Cir. 1985) (finding DOT's Section 4(f) analysis of the affected properties in an EIS "limited" and "lack[ing] of specificity," and thus, remanding DOT's decision to require "an accurate assessment of the characteristics of the property that will be affected by the alternative"); *see also Citizen Advocates*, 770 F. 2d at 436 n.14 ("Since there is no showing as to how the [agency] arrived at that conclusion, the administrative record must be viewed as incomplete, unreviewable, and incapable of supporting that statement.")

FAA's assertion that the affected areas had previously experienced aircraft overflights before the RNAV routes is insufficient to meet FAA requirements and lacks record support. Order 1050.1E requires that impacts to Section 4(f) resources be based on actual or predicted noise levels, not whether some aircraft may have overflown an area in the past. *See id*. app. A ¶ 6.2g, AD-072. FAA's modeling showed substantial noise increases for 19 parks and 25 historic properties. *See* JA-365. Rather than analyze the effect of those noise increases based on the properties' attributes, FAA simply *assumed* that park users had potentially heard aircraft in the past and that therefore the RNAV routes would not

substantially impair the affected Section 4(f) resources. However, "conclusory statements will not do; '[FAA's] statement must be one of reasoning.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted).

The inadequacy of FAA's conclusions in the Initial Review is made clear by the actual effects of the new RNAV routes. The City provided specific information about how the routes were impairing specific functions for City parks that relied on quiet as an essential attribute. JA-804. For example, the City showed that Encanto Park has been "used" for Section 4(f) purposes:

> Encanto Park has been listed by Forbes magazine as one of the twelve best urban parks in the country. Phoenix residents depend on the park as an oasis of calm, quiet and beauty. [Encanto Park] provides opportunities for art, nature contemplation, wildlife watching and outdoor music that are very noise sensitive. Encanto Park has long provided a number of outdoor fora for weddings and wedding receptions, including Amphitheatre Island and the Valley Garden Center. It hosts special music events throughout the year. These are critical Section 4(f) uses that depend on quietude and can be subject to speech interference from the new aircraft overflights.

*Id*. The City supplied FAA with noise monitoring data showing that RNAV noise in Encanto Park is well in excess of levels that cause speech interference and the noise levels when the RNAV routes are not used. JA-814. These are precisely the sort of impacts that constitute "constructive use" under Section 4(f). *See Citizen Advocates*, 770 F. 2d at 441–42 n.14 (inadequate Section 4(f) review of highway

project where there was no analysis of noise effects on park with symphony, picnic and other uses that depended on quiet).

Nonetheless, FAA made *no* response at all to the City's specific evidence and concerns regarding park impacts. Thus, FAA "failed to provide a reasoned explanation" in the face of evidence contradicting its Section 4(f) determination. *See Petroleum Commc'ns*, 22 F.3d at 1172.

## IV. FAA VIOLATED THE APA BY FAILING TO COMPLY WITH ORDER 7100.41.

The FAA's treatment of the City during the PBN Working Group process violated Order 7100.41 and the APA. Order 7100.41 requires FAA to "[e]nsure all stakeholders are included" on the Working Group (*id*. at 2-2, AD-079), including the "Airport Authority" as a "principal participant." *Id*. at A-1, AD-097, A-5, AD-101. Order 7100.41 defines the Airport Authority's primary purpose on the Working Group as providing "input on procedure and route design, including any potential operational or environmental impacts to the airport and surrounding communities." *Id*. at A-5, AD-101. Yet FAA excluded the City from all but two initial meetings in the process, *supra* at 24, even failing to list the City as a member of the Working Group in Final Report's Scoping Document. JA-1077. Despite the City's efforts to participate in the Working Group, FAA excluded it from all of the design and evaluation meetings. JA-1093. Further, in violation of Order 7100.41, FAA excluded the City from the drafting of the Final Report and

recommending "process and implementation improvements." *See* Order 7100.41 at 2-18, AD-095. FAA also violated Order 7100.41 by not addressing or mentioning any of the information submitted by the City (outside of the closed meetings) showing significant historic, park, and noise impacts.

To invite the City to be an "important player" on the PBN Working Group, as Administrator Huerta did, then prevent the City from participating in the post-implementation process, and then ignore information the City provided about environmental impacts, is arbitrary and in violation of Order 7100.41 and the APA. *See National Conservative Political Action Comm*, 626 F.2d at 959.

## V.    FAA VIOLATED NEPA BY RELYING ON A CATEGORICAL EXCLUSION.

The FAA may not use a categorical exclusion instead of an EA or EIS if "extraordinary circumstances" exist. *Supra* at 10–11. The RNAV routes created "extraordinary circumstances" because they impose adverse effects on historic and Section 4(f) properties and are highly controversial.

### A.    FAA Had No Basis to Conclude that the RNAV Routes Would Not Have Significant Impacts on NHPA and Section 4(f) Resources.

Extraordinary circumstances include "[a]n adverse effect on cultural resources protected by the [NHPA]" and "an impact on properties protected under section 4(f)." Order 1050.1E ¶¶ 304a, 304b, AD-056. As detailed above, *supra* at 21–23, the RNAV routes have an adverse effect on historic and Section 4(f)

properties and FAA did not undertake the process necessary to draw conclusions regarding those resources.  Prior to implementation, FAA *assumed* there would be no impacts without conducting the analysis or studies needed to validate that assumption, even though FAA knew that the RNAV routes would fly over and affect historic and Section 4(f) properties.  FAA issued its categorical exclusion without consulting with the City's Historic Preservation Officer or parks officials on the potential effects to NHPA and parks properties and the role of quiet for those properties, thus depriving itself of the information necessary to assess adverse effects.  Having failed to obtain necessary relevant information, FAA's decision was arbitrary and capricious.  *See Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002) (invalidating FAA's determination of no significant impact of new airport on Zion National Park where FAA "had not evaluated existing noise impacts as well as those planned impacts that will exist by the time the new facility is constructed and in operation").

### B.    The RNAV Routes Are Highly Controversial, Which Was Clear to FAA at the Time of Its Categorical Exclusion.

Extraordinary circumstances also exist where there are "[e]ffects on the quality of the human environment that are likely to be highly controversial"— meaning "a substantial dispute exists as to the size, nature, or effect of a proposed Federal action."  Order 1050.1E ¶ 304i, AD-057.  In determining the extent of controversy, FAA must consider "[o]pposition on environmental grounds by a

Federal, State, or local government agency or . . . by a substantial number of persons affected by the action . . . ." *Id*.

Although FAA identified two areas of the City that would experience an increase of 5 dB or more within a range of DNL 45–60 dB noise exposure with the "potential for extraordinary circumstances" (JA-333), FAA concluded that "given the location and degree of noise increase" the routes "are not likely to be highly controversial on environmental grounds." JA-367. FAA provided no support for these conclusions, but simply checked the box in the "Community Involvement" section of the Initial Review that FAA had not "received one or more comments objecting to the proposed project on environmental grounds from local citizens or elected officials." JA-364.

This conclusion was arbitrary and unsupported. FAA's statement implies that it had sought input on the environmental impacts from the City's Historic Preservation Officer, City parks officials, and the public. However, FAA never consulted with the City experts on the properties impacted by the RNAV routes. FAA did not provide *any* public notice of the proposed routes, the Initial Review, or the categorical exclusion. FAA held no public hearings and did not provide any opportunity for the public to review and comment on the RNAV routes. Having failed to make any attempt to gauge public reaction to the RNAV routes, FAA had no basis to assume that the RNAV routes would not be controversial. *See Am. Bird*

*Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1035 (D.C. Cir. 2008) (finding that the FCC failed to comply with NEPA procedures; "[i]nterested persons cannot request an EA for actions they do not know about, much less for actions already completed").

Moreover, FAA's failure to prepare an EA is a departure from FAA's own practice and policy. *See* JA-790–92. (discussing numerous examples of FAA conducting EAs for projects, even where projects caused lesser noise increases than the RNAV routes in Phoenix). FAA's EAs—prepared by the same FAA Air Traffic Organization—make clear that an increase of 5 dB in the DNL 45–60 dB contours causes community noise concerns and complaints constituting extraordinary circumstances requiring an EA. JA-799. As stated by FAA in its May 2013 EA for RNAV procedures at Boston Logan International Airport, "FAA experience [is] that increases in noise of 5 dB between the DNL 45 and 60 dB ha[ve] the potential to be highly controversial on environmental grounds . . . ." *Id.* FAA made the same conclusion in recent EAs for similar projects in Northern California, Charlotte, and Atlanta. *See id*. In projects similar to Phoenix, FAA conducted extensive public outreach and engagement with government officials and stakeholders on the noise impacts that did not rise to FAA's threshold level of significant impacts. *Id.*

FAA's practice is applicable in Phoenix, because the RNAV routes shifted longstanding flight patterns away from areas with land uses designed to be compatible with aircraft overflights to residential and historic neighborhoods that had not been under flight paths before and were not designed to be compatible with aircraft noise. FAA should have foreseen controversy and prepared an EA as it had done when implementing similar procedures in other cities. Instead, FAA inexplicably departed from agency practice. *See W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) ("It is textbook administrative law that an agency must provide a reasoned explanation for departing from precedent or treating similar situations differently."). In violation of NEPA, without any factual support and without gathering needed information, FAA just assumed no controversy. *See Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1191 (8th Cir. 2001) (affirming categorical exclusion where decision was based on "all relevant factors and available evidence relating to the noise impact" and "not on mere speculation").

### C. FAA Failed to Reevaluate Its Categorical Exclusion in Violation the APA and NEPA.

Even if FAA acted reasonably in issuing the categorical exclusion based on untested assumptions, the APA and NEPA required FAA to address substantial evidence presented after the initial implementation of the RNAV routes (and before its final completion of the Order 7100.41 process) that showed that FAA's

assumptions in the categorical exclusion were wrong.  NEPA requires an agency to "consider every significant aspect of the environmental impact of a proposed action" and "ensure that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co.*, 462 U.S. at 97.  The APA requires an agency to explain its decision and address contradictory evidence.  *See Petroleum Commc'ns*, 22 F.3d at 1172.  An agency cannot rely on facts it knows, or has substantial reason to believe, are incorrect.  *See id*.  FAA failed these tests in implementing the RNAV routes.

As detailed above, in the nine months following the initial implementation, the City, the SHPO, and others presented the FAA with evidence demonstrating that the FAA's assumptions were incorrect.  *Supra* at 19–23.  The enormous increase in noise complaints and the public outcry regarding the RNAV routes clearly demonstrated that the routes were subject to public controversy undermining FAA's finding of no extraordinary circumstances. *Supra* at 17.  FAA itself admitted that there were far greater impacts than it assumed.  JA-763.  And, the information submitted to FAA was not unsolicited.  Following initial implementation, FAA repeatedly sought, or at least appeared to be interested in, the City's and public's input.  FAA's highest official, Administrator Huerta, told the City that FAA was "committed to exploring possible adjustments to the new procedures" and went so far as to reconvene the PBN Working Group on which the

City would be "an important player." JA-750. In response, the City submitted thousands of pages of detailed technical and planning evidence demonstrating that the categorical exclusion was wrong and needed to be re-evaluated. FAA simply ignored it, even as it undertook the Working Group process and finalized its routes. FAA's treatment of the City and the information showing significant impacts was unexplained and capricious.

FAA's actions were arbitrary because its environmental review and route design processes were ongoing. FAA issued an Errata to the Initial Review in November 2014, indicating a willingness to reconsider a piece of its categorical exclusion, but failed to address the wealth of new information on noise impacts and public controversy since the September 2014 initial implementation date. JA-610. FAA also informed the City that it had made unspecified changes to address aircraft that were taking early turns outside of the RNAV procedures. JA-609. However, FAA did not conduct an environmental review of the early turns, nor did it conduct an environmental review of the new adjustments that required consideration of the mounting evidence of the RNAV routes' significant impacts.

In its Final Report, FAA purported to evaluate the environmental impacts of possible post-implementation minor adjustments, but failed to incorporate or address *any* of the new information in its analysis and summarily concluded that it was unnecessary to change its environmental analysis in the Initial Review and

60

categorical exclusion. JA-1071. After seeking the City's comments on the Final Report, the June Letter showed that FAA again ignored the City's information on noise impacts and proposed alternatives to address them.

Rather than incorporate the new information in its ongoing decisionmaking process, FAA just ignored the information that did not support its initial determination. This approach to decision making is inconsistent with both NEPA and the APA; FAA may not simply ignore facts that it dislikes. *See Petroleum Commc'ns*, 22 F.3d at 1172.

## CONCLUSION AND RELIEF SOUGHT

The City respectfully requests that the Court vacate and remand FAA's decision to implement the RNAV routes and require FAA to (1) adequately consider the noise impacts of the routes under NEPA, (2) enter into consultation with the City in compliance with the NHPA and Section 4(f), and (3) analyze and determine measures that could avoid, minimize, or mitigate adverse effects on NHPA and Section 4(f) properties.

Vacatur of FAA's action is appropriate. *See New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 473 (D.C. Cir. 2012) (vacating NRC's rulemaking because of deficient NEPA environmental review). Under *Allied-Signal v. Nuclear Regulatory Comm'n*, a decision to vacate "depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the

agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  988 F.2d 146, 150–51 (D.C. Cir. 1993) (citation and quotation marks omitted).  Both *Allied-Signal* factors support vacating FAA's implementation of RNAV routes.  First, FAA's failure to consult with the City under NHPA and Section 4(f), and adequately assess the noise impacts of the RNAV routes, led to an action that, by FAA's own admission, has substantial noise impacts on the City.  FAA's compliance with the NHPA, Section 4(f), and NEPA will likely result in a modification of the RNAV routes to address noise impacts. Second, vacatur would not disrupt FAA's operations at the Airport.  During FAA's reevaluation of the RNAV routes, FAA can safely and efficiently use the pre-September 18, 2014, arrival and departure flights paths that currently remain in place.  JA-1095; JA-1097–98.

Respectfully submitted on August 25, 2016.

Attorneys for Petitioner City of Phoenix:

/s/ *John E. Putnam*
John E. Putnam
jputnam@kaplankirsch.com
Peter J. Kirsch
pkirsch@kaplankirsch.com
Nathaniel H. Hunt
nhunt@kaplankirsch.com
KAPLAN KIRSCH & ROCKWELL LLP
1001 Connecticut Avenue, NW, Suite 800
Washington, DC 20036
(202) 955-5600
(202) 955-5616 (fax)

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 28(a)(10) and 32(a)(7)(C), I certify on this 25th

day of August, 2016, that:

1.   This brief complies with the type-volume limitation of Fed. R. App. P.
     32(a)(7)(B) because:

     ■    this brief contains 13,720 words, excluding the parts of the brief
          exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

     □    this brief uses a monospaced typeface and contains [*state the number
          of*] lines of text, excluding the parts of the brief exempted by Fed. R.
          App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P.
     32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

     ■    this brief has been prepared in a proportionally spaced typeface using
          Microsoft Office Word 2010 in 14 point Times New Roman Font, *or*

     □    this brief has been prepared in a monospaced typeface using Microsoft
          Office Word 2010 with [*state number of characters per inch and
          name of type style*].

                              /s/ *John E. Putnam*
                              John E. Putnam

## CERTIFICATE OF SERVICE

I certify that on this day, August 25, 2016, I electronically filed this Final Brief with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system. Counsel for all parties are registered to use that system and, to my knowledge, will receive copies of this document upon its filing.


/s/ *John E. Putnam*
John E. Putnam